**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 14-107 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS ABRAM SLATTEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR RELEASE PENDING RETRIAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motion for release pending the retrial in this case.

Defendant's motion rests on the erroneous premise that nothing has changed since the three short periods of pretrial release that he previously served in this case. To the contrary, defendant's prior release status was in large part attributable to the dismissal of two indictments in this case. Since that time, the government obtained a new indictment charging defendant with first-degree murder, and this Court presided over the lengthy trial. During that trial, the Court had the opportunity to evaluate firsthand the government's evidence regarding the defendant and his actions on September 16, 2007. This evidence established that the defendant is an extremely dangerous person who believes that some human beings – particularly Iraqis – are no more than animals, and that he is willing to act on those beliefs by committing murder. In addition, the defendant now knows that the government's case was strong enough that it obtained a jury verdict of guilty, a prospect he openly discounted before his first trial. Now, defendant once again faces a life sentence if convicted at his retrial – something he has previously said he will not abide. Thus,

defendant's incentive to flee and avoid retrial has only increased. Defendant's long history of threats, assaults, and misuse of firearms during the pendency of this case also show that he is a dangerous individual who does not submit to authority. Indeed, the government submits that as the Court evaluates the applicable factors under 18 U.S.C. § 3142(g), it will agree with the government that there are no conditions or combinations of conditions that will reasonable assure the appearance of the defendant as required or the safety of any other person and the community.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

### A.  Defendant's Prior Periods of Pretrial Supervision

The long and tortured history of this case resulted in three separate periods of pretrial supervision for the defendant. On December 4, 2008, a grand jury returned a 35-count indictment against the defendant and his codefendants, charging him with manslaughter, attempted manslaughter, and a related firearms charge for the actions committed at Nisur Square on September 16, 2007. At the time, the court released the defendant pending trial with a number of conditions. Approximately a year later, following Judge Urbina's dismissal of the indictments in this case, the defendant's supervision was terminated.[1] Following the successful government appeal of Judge Urbina's decision, on October 17, 2013, another federal grand jury returned a 33-count indictment against the defendant and his codefendants, similar to the original indictment. After the defendant was arraigned in December 2013 on the superseding indictment, he was released again pending trial subject to a number of conditions. Although, as detailed below, the defendant was not compliant during his second period of supervision, his supervision was terminated once again when the superseding indictment against him was dismissed as time-barred

---

[1] Defendant was originally on pretrial release from January 6, 2009, to December 31, 2009. *See* April 6, 2015, Presentence Investigation Report [Docket No. 638] (hereinafter "PSR") at 4-6.

in April 2014.[2]  Finally, when a grand jury indicted the defendant a third time a few weeks later

on a first-degree murder charge – and just a few weeks before the beginning of the original trial in

this case – the defendant was released pending trial with conditions.  The defendant has been

detained since a jury found him guilty as charged on October 22, 2014.[3]  Thus, defendant is

incorrect in suggesting that he has been on pretrial release for almost ten years.  He has been on

pretrial release for a total of about 22 months, during which time he was not compliant with court

supervision and demonstrated through his actions that he poses a danger to the public.[4]

**B.  Defendant's Prior Dangerous Actions and Threats Before Trial in 2014**

The Court is familiar with the facts elicited during trial regarding the actions of the

defendant and his co-defendants at Nisur Square on September 16, 2007, so the government will

not repeat those in this pleading.[5]  Instead, the government will incorporate by reference the

factual summaries included in the Government's Sentencing Memorandum [Docket No. 646] and

the Government's Opposition to Defendant's Motion for a New Trial [Docket No. 664].  However,

it is worth emphasizing that contrary to the defendant's assertions about the weight of the evidence

in this case, this court previously heard argument from defense counsel at trial about the sufficiency

---

[2] Defendant was on pretrial release from December 3, 2013, to April 23, 2014. PSR at 6-7.

[3] Defendant was on pretrial release from May 13, 2014, to October 22, 2014. PSR at 8.

[4] Defendant repeatedly claims in his motion that the government and the court "agreed" that the defendant was not a flight risk or presented a danger to the community because the government did not seek, and the court did not order, that the defendant be detained before trial.  To put it simply, as demonstrated through this response, that assertion by the defense is an incorrect characterization of the circumstances surrounding those decisions at the time.  More importantly, there should be no doubt that when looking at the totality of defendant's history and actions during the past ten years, the government considers the defendant a serious flight risk and a danger to the community.

[5] The evidence at trial also included prior actions and statements by the defendant while a Raven 23 member in Baghdad, Iraq, before the massacre at Nisur Square on September 16, 2007.  This evidence demonstrated that the defendant had a very low opinion of Iraqis, who he blamed for the September 11 attack on the United States, and that he had previously acted upon his beliefs by firing his weapon contrary to the use of force policy in effect for engagements.  Afterwards, the defendant even bragged about his actions, saying about one incident that he had turned an Iraqi's head into a "canoe" – meaning that he put a large hole in the man's head.

3

of the evidence at various stages, including during the motion for a new trial, and the Court correctly denied all of those motions. Similarly, during the sentencing hearing – will full knowledge of the prior statements by co-defendant Slough – after the defendant proclaimed his innocence at the hearing, the Court stated in response: "I reject your argument that you're innocent, and I fully support the jury's verdict in this case that you are in fact guilty as charged and the evidence supports that." [April 13, 2015, Tr. at 147]. Indeed, even the appellate court that reversed defendant's conviction held that the evidence presented at trial was sufficient for a finding of first-degree murder. *See United States v. Slatten*, 865 F.3d 767, 797 (D.C. Cir. 2017).

Before the jury rendered its verdict in October 2014, however, the defendant repeatedly engaged in a number of dangerous confrontations with law enforcement or other persons, where he made various threats or statements that are of serious concern to the government. The defendant was also convicted by a jury in Tennessee of assault arising out of a dangerous incident.

### 1.   Arrest for Firing Handgun and Attempting to Evade Arrest[6]

On July 30, 2011, a Tennessee Wildlife Resource agent saw the defendant inside of a truck firing a handgun from the driver's window across a road. According to the police reports, when the agent attempted to conduct a traffic stop by turning on his emergency equipment, the defendant drove away, refusing to stop, and continued driving towards his residence. The agent pursued the defendant for approximately 5 to 7 miles and called for backup from the White County Sheriff's Department, ultimately catching up with the defendant at his residence on Cedar Creek Road. When the agent asked the defendant why he had not stopped, the defendant responded that the agent did not have the authority to stop him. When one of the first officers from the Sheriff's

---

[6] For a short summary of this incident, see PSR at 14-15. In addition, for the Court's review, attached to this response as **Exhibit A** are copies of the incident reports prepared by three separate officers with the White County Sheriff's Department, an incident report prepared by the Tennessee Wildlife Resource agent who stopped the defendant on that day, as well as a copy of the indictment returned in that case.

Department arrived on scene, he saw the defendant in a very agitated state, near his father, and the defendant and his father were both arguing with the agent.  When the officer attempted to place handcuffs on the defendant, the defendant initially refused to put his hands behind his back, and the officer ended up putting the cuffs on the defendant in the front because the defendant's father came towards the officer to confront him and he did not have enough time to force the defendant to comply.  During this time, according to the police report, the defendant stated that if he wanted to kill them [agent and officers] that he could do so.  The defendant then stated that everyone would pay for what they were doing, and that the officer knew who he was -- a sniper.  The defendant's father also told the law enforcement officers that they were lucky because no one goes into someone else's property without getting into trouble.

After securing the defendant, the agent recovered from the vehicle being used by the defendant a Glock pistol and two loaded military-style assault rifles with telescopic sights.  To the officer who transported the defendant to the station, the defendant stated that if he was not put in solitary confinement while in jail that he would kill his cellmate and that he was prepared to spend the rest of his life in prison.  According to the Office of the District Attorney General for White County, Tennessee, this case was ultimately dismissed on or about March 11, 2015, after the defendant was convicted in the case before this Court.

## 2.  Arrest for Aggravated Assault While Armed[7]

On November 19, 2011, White County Sheriff's officers were dispatched to a feed store in town for a report of an assault with a firearm.  According to the victim, the defendant followed him into the parking lot of the store.  When the victim exited the store, the defendant approached

---

[7] For a short summary of this incident, see PSR at 13-14.  In addition, for the Court's review, attached to this response as **Exhibit B** are copies of the incident report from the White County Sheriff's Department as well as copy of the indictment returned in that case.

and said that he did not like his attitude.  The defendant then kicked the victim between the legs and pulled out a pistol -- pointing the pistol at the victim's head and ordering him to the ground. When a store employee ran outside and said that the police had been called, the defendant left the scene.  Former co-defendant Dustin Heard was also in the store when the defendant attacked the victim.  When asked by the victim and a store employee if Heard knew the man with the gun, Heard claimed that he did not.  When pressed further, Heard stated that the defendant looked like a friend.  Heard also left before the police arrived.  The defendant was charged with Aggravated Assault, False Imprisonment, and Assault, and the case was tried on or about January 2013.  The jury could not reach a unanimous verdict on the Aggravated Assault charge, but found defendant guilty of simple assault.  According to the Office of the District Attorney General for White County, Tennessee, sentencing in this case was originally continued and remains to be completed.

### 3.  Report of Defendant's Threat Against Pharmacy Employee[8]

On May 16, 2012, a police report indicates that during a phone call to a pharmacy regarding the denial of his request for a prescription refill, the defendant asked the employee if she knew who he was dealing with and told her to read the newspaper and watch the news.  After having his doctor approve the refill, the defendant went to the pharmacy and told the employees that he would file a lawsuit but made no additional threats.

### 4.  Defendant's Confrontation With Officer from Sheriff's Department[9]

On July 20, 2012, an officer from White County's Sheriff Department was dispatched to investigate a claim involving the destruction of property of a mailbox and part of a fence.  After

---

[8] For the Court's review, attached to this response as **Exhibit C** is a copy of the General Report taken by Sparta Police Department for this incident.

[9] For the Court's review, attached to this response as **Exhibit D** is a copy of the incident report from the White County Sheriff's Department.

taking a report and collecting a piece of a taillight from a Ford vehicle that appeared to be related to the damage, the officer left the scene.  One of the victims later called the Sheriff's Department and told the officers that s/he had found a vehicle that could have been involved in the incident and provided the vehicle's location.  The officer went to investigate, and located the vehicle with clear evidence of damage consistent with an accident, which was registered to the defendant.  As the officer was looking at the vehicle, he saw the defendant approach him with a handgun in his hand pointed at the ground.  The officer instructed the defendant to put the gun down.  While the defendant complied with this command, he began to argue with the officer that it was not illegal for him to have a gun in his property.  The officer explained the reason that he was inspecting the truck and, as the officer began to conduct his investigation and take pictures of defendant's truck, the defendant became upset, accusing the officer and his department of trying to "set him up" by planting evidence on him.  During one exchange with the officer the defendant said that he was a "war vet and that he "killed people."  The defendant also stated that he was a trained sniper and that he knew how to fight.  The officer also saw inside the defendant's truck a large magazine for an automatic weapon that was full of ammunition.  Ultimately, the officer decided to leave and, as far as the government has been able to determine, no charges were filed against the defendant.

### 5.  Investigative Stop for Possession of Firearms and Ammunition[10]

On August 20, 2012, a police report indicates that an officer on patrol saw the defendant, who was acting suspiciously, walking with a holster and loaded clips on his person.  Two officers ultimately approached the defendant to investigate, and the defendant was uncooperative and belligerent from the start.  The defendant was handcuffed, and the officers removed two pistols and several 30-round magazines from the defendant's person with 45-caliber ammunition as well

---

[10] For the Court's review, attached to this response as **Exhibit E** is a copy of the Preliminary Investigative Report taken by the Cookeville Police Department for this incident.

as four pocket knives.  The defendant said that he had served in the military and that he had a valid carry permit.  Upon learning that one of the officers had called his girlfriend to check on her welfare due to a suspected domestic abuse incident, the defendant became upset and said that he was not "going back to jail."  The defendant also said that they would need 12 more officers [presumably to subdue him] and that "**he would rather take a round to his face than go back to jail.**" (Emphasis added).  After the officers confirmed that the defendant had a valid permit for the firearms, and the girlfriend did not cooperate and refused to admit that anything had happened, the officers released the defendant and no charges were filed.

### 6.  Defendant's Combative Attitude and Threats Towards U.S. Pretrial Personnel

During the defendant's second period of pretrial supervision, which began in December 2013, the U.S. Probation and Pretrial Services Office for the United States District Court for the Middle District of Tennessee ("MDTN") agreed, as a courtesy, to conduct defendant's pretrial supervision because the defendant resided in its district.[11]  MDTN personnel experienced repeated noncompliance by defendant and ultimately deemed him a "security risk."  PSR at 8.

When the problems with supervision of the defendant began, on January 10, 2014, the Deputy Chief U.S. Probation Officer at MDTN took the initiative to personally call the defendant -- who at the time was refusing to talk to the pretrial officer that was assigned to his case -- in an attempt to calm the defendant and bring him into compliance with the orders of the Court.[12]  The defendant told the Deputy Chief that the pretrial officer had been disrespectful and that "**no one was going to tell him what to do.**" (Emphasis added).  When the Deputy Chief attempted to

---

[11] For a summary of the difficulties the defendant created while under pretrial supervision, see PSR at 6-8.

[12] For the Court's review, attached to this response as **Exhibit F** is a copy of the letter prepared by the Deputy Chief detailing the phone conversation he had with the defendant on January 10, 2014.  The government notes that, as the Court will be able to determine, this letter is mistakenly dated January 9, 2014, instead of January 10, 2014, and that the letter is also mistaken as to the year that the conversation took place, which is listed as January 10, 2013, instead of January 10, 2014.

explain to the defendant that they were required to ensure that the conditions of his release were followed, the defendant raised his voice on the phone, became argumentative, and kept repeating that MDTN had no jurisdiction over his case.

Among the many things that the defendant said during the conversation with the Deputy Chief, the defendant stated that: (1) he had been exposed to so many IEDs, phosphorus bombs, and the stress of war that he understands that he does not have long to live; (2) he suffers from Post-Traumatic Stress Disorder and does not sleep much; and (3) MDTN personnel do not want to meet his father, who is very angry and furious with the government about how his son has been treated and that MDTN does not supervise his father and cannot tell him what to do. The defendant refused to meet with anyone from MDTN except at his residence. Ultimately, during this conversation, the defendant refused to come to MDTN's satellite office and said that if MDTN wanted to see him, that they would have to come to his house. He again repeated that nobody was going to tell him what to do. Understandably, MDTN personnel did not feel safe conducting a home visit due to the defendant's hostile nature, the threats he had previously made and the threats he was making during the phone call, as well as the defendant's mental state and access to weapons. The only request that MDTN had made of the defendant at the time was to come to the office and provide one urine sample.

The defendant's attorneys finally convinced him to come to MDTN's offices and provide a urine sample, which the defendant did on February 24, 2014.[13] Once again, the defendant was defiant, obstinate, and argumentative, even refusing to sign the standard drug testing forms despite

---

[13] For the Court's review, attached to this response as **Exhibit G** is a copy of the February 26, 2014, Pretrial Request for Revocation / Removal from PSA Supervision (with attachments), that includes a copy of the text of a communication from the from Deputy Chief U.S. Probation Officer for MDTN to DC Pretrial Services, where the Deputy Chief documented his meeting with the defendant on February 24, 2014. Because these type of documents are not generally publicly available and contain personal information about the defendant, the government will seek to have this particular Exhibit filed under seal.

approval by his attorney.  The defendant claimed that the Deputy Chief had been disrespectful previously, and he said that he hoped that the Deputy Chief died of a heart attack because the Deputy Chief was a sorry human being who was trying to set him up with a positive drug test.  The defendant also referred to MDTN personnel as "scum" and before leaving told the Deputy Chief that one day his heart would stop beating and that the world would be a better place as a result.  The defendant also attempted to intimidate the Deputy Chief by making antagonistic comments and with cold hard stares.

In his summary conclusion in the communication about this meeting with DC Pretrial Services, the Deputy Chief U.S. Probation Officer for MDTN stated that, in their opinion at MDTN, the defendant would not "comply with any further directives to report to our office and attend any type of treatment."  "It is obvious he has contempt for our agency and the government and **would not be safe for our officers to have contact with him in the field for community supervision**." (Emphasis added).

### 7.   Arrest for Obtaining Drugs by Fraud[14]

On May 8, 2014, the defendant was also charged with obtaining by fraud Alprazolam, a Schedule IV controlled substance, on or about April 22, 2014.  According to the Office of the Clerk for White County, Tennessee, this case was ultimately dismissed on or about March 11, 2015, after the defendant was convicted in the case before this Court.

### C.  Defendant's Characteristics[15]

The defendant is currently 34 years old, single, and does not have any children.  Before his incarceration, he resided with his parents in Sparta, Tennessee.  The defendant earned a high school

---

[14] For a short summary of this incident, see PSR at 15.

[15] For a more detailed description of defendant's characteristics, the government respectfully refers the Court to the PSR at 15-20.

education, and he joined the United States Army in 2002, where he became a sniper for the 82nd Airborne.  While in the Army he served two tours in Iraq.  He was honorably discharged from the Army in 2006, and he then began his employment with Blackwater, USA – going back to Iraq as a private security contractor designated as a Defensive Marksman/Personal Security Specialist. Presumably, because of his work as an Army sniper overseas, as well as his work for Blackwater USA, the defendant has significant contacts and experience living overseas.

After returning to the United States from Iraq in 2007 following the massacre at Nisur Square and the termination of his employment, the defendant was diagnosed with Post-Traumatic Stress Disorder.  The defendant has not been employed since then, and before his incarceration, he relied for financial support on bi-weekly disability insurance payments as a result of his mental health status.  As detailed in the previous section, since his return to the United States, in addition to his conviction for assault, the defendant has had a number of troublesome and dangerous encounters with law enforcement personnel and others that have escalated through the years.[16]

## II.   ARGUMENT

### A.  Legal Standard

Under 18 U.S.C. § 3142(e), if a judicial officer finds after a detention hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."  The district court's risk of flight and dangerousness

---

[16] The defendant became such a serious security concern to the Tennessee law enforcement community that two reports were prepared about him by the Tennessee Fusion Center ("TFC").  First, on November 23, 2011, the TFC published a Suspicious Activity Report, attached to this response as **Exhibit H**.  Second, on August 22, 2012, the TFC published an Officer Safety Bulletin regarding the defendant, attached to this response as **Exhibit I**, warning officers about the defendant, his prior threats and encounters with law enforcement, and informing officers of the high likelihood that the defendant would be armed if they encountered him. Because both of these reports are law enforcement sensitive documents, the government will seek to also file these two additional Exhibits under seal.

determinations must be supported by a preponderance of the evidence. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). Those determinations are guided by four statutory factors: (1) the nature and circumstances of the charged offense; (2) the weight of the evidence against the person; (3) the person's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

## B. Evaluation of Factors Under 18 U.S.C. § 3142(g)

### 1. Nature and Seriousness of the Offense

The defendant has every reason to flee before retrial. He unquestionably is charged with a serious crime – first-degree murder – and a jury previously found him guilty of that crime. The nature of the charge, and the previous jury finding of guilt on this charge, help to demonstrate the danger that the defendant represents to the community. The defendant also faces life imprisonment if convicted following his retrial. Therefore, both the charge and the potential sentencing exposure in this case provide defendant with a strong motive to flee. *United States v. El Hage*, 213 F.3d 74, 80 (2d Cir. 2000) (prospect of life imprisonment creates strong motive to flee); *United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990) (affirming pretrial detention on basis of flight risk where defendants, inter alia, faced "severe penalties"); *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir.1991) (defendant's knowledge that a jury previously rejected his defense and that he was then sentenced to a lengthy period of incarceration makes it more likely the he will flee). *Cf. Xulam*, 84 F.3d at 442 (charged nonviolent misdemeanor offense did not support detention).

### 2. The Weight of the Evidence Supports Detention

This factor goes to the weight of the evidence of dangerousness and risk of flight, not to the weight of the evidence of the defendant's guilt. *See United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010) (noting that the weight of evidence against the person "deals with the factors to be

considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"); *see also Gebro*, 948 F.2d at 1121 (Section 3142(g) "neither requires nor permits a pretrial determination of guilt").   In addition to the relevant facts elicited during trial, the government's evidence on this issue, which includes defendant's PSR and the documents obtained from Tennessee law enforcement agencies about defendant's threats and actions, is reliable and amply supports detention.  *See, e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C.Cir.1996) (with respect to establishing need for pretrial detention, "[e]very circuit to have considered the matter . . .  [has] permitted the Government to proceed by way of proffer."). That evidence is set forth elsewhere in this pleading and we will not be repeated here.

The defendant spends much effort arguing that the evidence of guilt against him is not strong given that he can use co-defendant Slough's statement in his defense.  Even assuming, arguendo, that the government's evidence of guilt is even relevant to this inquiry, the defendant is incorrect.  First, that the defendant may have defenses at trial does not undercut the government's showing of dangerousness or risk of flight. *See Townsend*, 897 F.2d at 995 ("whether in fact [the defendant] did the things of which [he is] accused, we do not and cannot anticipate what a jury will find or what defenses might be offered or what evidence might be excluded . . . the weight of the evidence proffered tells in favor of [the defendant] being [a] flight risk[]").

Second, defendant's demonstrated lack of candor in his interactions with MDTN about the alleged attitude and treatment that he had received from various pretrial officers also indicates that he is a flight risk.[17]   Courts routinely consider lack of candor as evidencing risk of flight. *See United States v. Khanu*, 370 Fed. Appx. 121, 122 (D.C. Cir. 2010) (lack of candor concerning real-

---

[17] Many of the law enforcement reports from Tennessee included as attachments to this response also demonstrate defendant's lack of candor in his interactions with personnel from various law enforcement agencies.

estate transactions showed risk of flight); *see also United States v. Bonilla*, 388 Fed. Appx. 78, 80 (2d Cir. 2010); *United States v. Mehmood*, 358 Fed. Appx. 767, 769 (8th Cir. 2010).

Third, defendant incorrectly assumes that the admission of Slough's statements during the retrial – that he fired at the white Kia, which was approaching the convoy at a high rate of speed, and that he does not know if he was the first to fire but he did not hear anyone else fire before he did – will significantly advance his defense.  During the week after the massacre, Slough gave several evolving and contradictory statements to State Department special agents.  Essentially, Slough claimed that after the convoy secured Nisur Square, all of a sudden, a white vehicle approached the convoy at a high rate of speed and, fearing an attack, he had to fire at the white vehicle to protect himself and the convoy.  Afterwards, the convoy then began to receive incoming fire from the south and later, from the east and west of the circle.  Slough even claimed that two vehicles north of the circle posed a threat.  Slough claimed that he had to fire at all of these alleged shooters and vehicles to neutralize the threats and protect the convoy.

As the Court is aware, the government presented overwhelming evidence at the last trial that demonstrates that Slough's self-serving statements are false.  The evidence includes, but is not limited to, testimonial and physical evidence establishing that: (i) Al-Rubia'y's white Kia was completely stopped before any shots were fired (multiple fact witnesses); (ii) the defendant fired first (Watson); (iii) once shot, Al-Rubia'y's white Kia creeped forward (multiple fact and expert witnesses); (iv) Slough fired his M203 at Al-Rubia'y's white Kia multiple times (multiple fact witnesses), reloading it in between (Murphy); (v) the convoy did not take incoming fire from the south or east, including during the time that the command vehicle was disabled due to Slough's own M203 grenade (multiple fact and expert witnesses); (vi) the convoy did not take incoming fire from the west, including from the red Tata bus stopped there (multiple fact witnesses, include

civilian passengers on the bus); and (vii) the convoy did not take incoming fire or have to respond to vehicle threats north of the circle, including the two vehicle referenced by Slough (multiple fact witnesses, including the victim drivers of the two cars Slough engaged).  In short, in light of the evidence available, the government will be able to effectively address Slough's statements and prove that the defendant, not Slough, was the person who murdered Al-Rubia'y.

### 3.   History and Characteristics of the Defendant Favors Detention

The history and characteristics of the defendant also favor detention.  The defendant has been unemployed since 2007, is single with no kids, and as previously discussed, the defendant has consistently had a number of disturbing confrontations with law enforcement officers and other persons since at least 2011.  A common theme in these confrontations or crimes has been the defendant's possession and use of firearms as well as his repeated refusal to submit to lawful displays of authority.  One of these confrontations led to a conviction for assault, and two other pending cases were ultimately dismissed after the defendant's conviction in this case.  Even more concerning, during all of these incidents, the defendant regularly threatened other individuals, and he referred to his previous job as a "sniper" and the fact that he "kills" people.  The defendant is a highly skilled sharpshooter, with experience with multiple types of firearms, and he does have the ability to carry out these type of threats.  He has also expressed his determination that he will not go back to jail, and he has even stated that he would rather take a round in the head than go back to jail.  The defendant is unquestionably a dangerous individual who poses a threat to the community or other persons if he were to be released pending retrial.

The defendant's pattern of abusive behavior and refusing to submit to authority was also in full display during his pretrial supervision by MDTN.  Not only did the defendant previously fail to comply with his conditions of release while he was being supervised in MDTN during 2014,

he even threatened and tried to intimidate the officers responsible for his supervision.  His actions led to the defendant being deemed a "security" risk, and MDTN refused to supervise him after the indictment on the first-degree murder charge because "it **would not be safe for officers to have contact with him in the field** for community supervision." *See* Exhibit G at 4 (emphasis added).

### 4.  Nature and Seriousness of Danger Also Favors Detention

During the government's discussion of the other applicable factors under 18 U.S.C. § 3142(g), defendant's dangerousness has been discussed and demonstrated to the Court.  For the same reasons previously discussed, the defendant – who is always armed and prone to confrontations – is clearly a danger to the community and should be detained pending trial.  The government will not repeat all of the same facts here.

### C.  No Combination of Conditions Will Reasonably Assure Defendant's Appearance At Trial and the Safety of Any Other Person and the Community

Ultimately, as discussed above, no condition or combination of conditions will reasonably assure the defendant's appearance at trial.  18 U.S.C. § 3142(e).  The defendant attempts to argue in his motion that other forms of monitoring short of pretrial detention will assure his appearance at trial.  On the contrary, home detention with electronic monitoring is insufficient in this case.  Although the Pretrial Services Agency can make arrangements for the FBI to receive "alerts," those alerts necessarily are after-the-fact.  *See Townsend*, 897 F.2d at 994-95 ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction).  *See also United States v. Abad*, 350 F.3d 793, 799-800 (8th Cir. 2003).  In addition, electronic monitoring can be defeated. *See, e.g., United States v. Williams*, 387 Fed. Appx. 282 (3d. Cir. 2010).

Further, those levels of supervision will not ensure that the public is protected from the defendant's dangerousness.  The defendant has been charged with committing violent offenses in

Tennessee while this case was pending, and he was found guilty of assault for the attack that took place on November 19, 2011, previously discussed.  This fact alone is sufficient justification for pretrial detention.  *See United States v. Anderson*, 670 F.2d 328, 329 (D.C. Cir. 1982) (affirming trial court finding of danger to the community "on the basis of the convictions of the two offenses [in that case] and his prior record," where defendant sought release pending appeal).  *See also United States v. Vance*, 851 F.2d 166 (6th Cir.), cert. denied, 488 U.S. 893 (1988) (seriousness of offenses of conviction weighed heavily in favor of detention).

In addition, as previously explained, the defendant has been resistant to supervision, and even threatened MDTN personnel and members of the public.  Indeed, the defendant has repeatedly stated that no one can tell him what to do, and that various law enforcement officers do not have jurisdiction over him.  These facts suggest that the defendant is not capable of abiding by any conditions of release and, standing alone, also support detention.  *See United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) ("Barone's failure to abide by the conditions of his initial bail release, when considered together with the lengthy term of incarceration he faced if convicted and the strength of the government's evidence, supported the district court's conclusion that Barone's proposed bail conditions could not reasonably assure his appearance at trial.").

Finally, the defendant is frequently armed and is prone to making threats, evidencing his dangerousness to the community at large.  *See United States v. Wingo*, 490 F. Appx 189, 191 (11th Cir. 2012) ("the district court's conclusion that Wingo posed a danger to the community was not clearly erroneous in light of testimony that Wingo possessed several weapons in his home despite the presence of three minor children and the probation officer's testimony that she feared for her safety at Wingo's home."); *Stone*, 608 F.3d at 948-54 (defendants' possession of weapons indicated that they posed "a serious danger to the community if released").

III.     CONCLUSION

For the foregoing reasons, and for any other reasons that may be elicited at a hearing on the defendant's motion, the government respectfully asks that the Court find that there are no conditions or combinations of conditions in this case that will assure the defendant's presence at trial and the safety or anyone or the community.


Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845


By:     _____/s/_____
        T. PATRICK MARTIN
        D.C. Bar Number 471965
        FERNANDO CAMPOAMOR-SANCHEZ
        D.C. Bar Number 451210
        Assistant United States Attorneys
        National Security Section
        United States Attorney's Office
        555 4th Street NW, 11th Floor
        Washington, D.C. 20530
        202-252-7698
        fernando.campoamor-sanchez@usdoj.gov

**<u>Certificate of Service</u>**

I certify that, by virtue of the Court's ECF system, a copy of the foregoing Government's Opposition to Defendant's Motion for Release Pending Retrial has been sent to counsel for the defendant on December 8, 2017.

/s/ Fernando Campoamor-Sánchez
Fernando Campoamor-Sánchez
Assistant United States Attorney